UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| ADVANCED SERIES TRUST, THE PRUDENTIAL SERIES FUND, PRUDENTIAL'S GIBRALTAR FUND, INC., PRUDENTIAL JENNISON SMALL COMPANY FUND, INC., PRUDENTIAL JENNISON MID-CAP GROWTH FUND, INC., PRUDENTIAL INVESTMENT PORTFOLIOS, INC., PRUDENTIAL INVESTMENT PORTFOLIOS 2, PRUDENTIAL INVESTMENT PORTFOLIOS 3, PRUDENTIAL INVESTMENT PORTFOLIOS 5, and PRUDENTIAL WORLD FUND, INC., <br><br> Plaintiffs, <br> v. <br><br> ZOOMINFO TECHNOLOGIES, INC., HENRY SCHUCK, PETER CAMERON HYZER, and JOSEPH CHRISTOPHER HAYS, <br><br> Defendants. | CASE NO. _____ <br><br> **COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

COMPLAINT AND JURY DEMAND - 1

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

## TABLE OF CONTENTS

NATURE OF THE ACTION ...............................................................................................4

JURISDICTION AND VENUE ..........................................................................................6

PARTIES .............................................................................................................................7

    I.     Plaintiffs ................................................................................................7

    II.    Defendants ............................................................................................9

    III.   Confidential Witnesses..........................................................................9

FACTUAL ALLEGATIONS .............................................................................................13

    I.     ZoomInfo's Origins and Business........................................................13

    II.    Defendants Assure the Market That ZoomInfo Is Experiencing Stable Growth Based on Its Reported "RPO" ......................................................................................18

    III.   Prior to ZoomInfo's IPO, Schuck Directed ZoomInfo to Sign Up Customers Without Regard to Their Ability to Pay ...........................................................19

    IV.   ZoomInfo Materially Overstated Its RPO in Violation of ASC 606.......................22

    V.    Internal Metrics Confirmed Declining Demand and Collectability Problems, Which Defendants Publicly Concealed.................................................................25

    VI.   Defendants Turned to Coercive Auto-Renewal Tactics to Mask Declining Demand and Manufacture Reportable Revenue ................................................................28

    VII.  Defendants' Massive, Well-Timed Insider Stock Sales........................................30

    VIII. The Truth Is Gradually Revealed ........................................................33

    IX.   Defendants' Post-Relevant-Period Admissions ..................................................36

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................................36

SUMMARY OF DEFENDANTS' SCIENTER ........................................................................52

PLAINTIFFS' ACTUAL RELIANCE ....................................................................................55

PRESUMPTION OF RELIANCE .........................................................................................56

LOSS CAUSATION ..........................................................................................................57

NO SAFE HARBOR .........................................................................................................58

FIRST CAUSE OF ACTION ...............................................................................................59

SECOND CAUSE OF ACTION ...........................................................................................61

THIRD CAUSE OF ACTION ..............................................................................................63

FOURTH CAUSE OF ACTION ...........................................................................................65

FIFTH CAUSE OF ACTION ..............................................................................................66

PRAYER FOR RELIEF .....................................................................................................67

JURY DEMAND................................................................................................................67

COMPLAINT AND JURY DEMAND - 2

**FENNEMORE CRAIG, P.C.**
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

Plaintiffs Advanced Series Trust, The Prudential Series Fund, Prudential's Gibraltar Fund, Inc., Prudential Jennison Small Company Fund, Inc., Prudential Jennison Mid-Cap Growth Fund, Inc., Prudential Investment Portfolios, Inc., Prudential Investment Portfolios 2, Prudential Investment Portfolios 3, Prudential Investment Portfolios 5, and Prudential World Fund, Inc. (collectively, "Plaintiffs") are purchasers of the common stock of ZoomInfo Technologies, Inc. ("ZoomInfo" or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, bring this action against Defendants ZoomInfo, Henry Schuck ("Schuck"), Peter Cameron Hyzer ("Hyzer"), and Joseph Christopher Hays ("Hays" and, together with ZoomInfo, Schuck, and Hyzer, "Defendants"). Except for allegations specifically concerning or involving Plaintiffs, which are alleged on personal knowledge, Plaintiffs' allegations are based upon information and belief such that Plaintiffs believe additional evidentiary support will be forthcoming in discovery.

Plaintiffs' information and belief is based on an investigation by their attorneys, which includes, among other things, a review and analysis of: ZoomInfo's public filings with the United States Securities and Exchange Commission ("SEC"); ZoomInfo's press releases; statements made by ZoomInfo's representatives at investor and industry conferences; ZoomInfo's earnings releases; earnings call transcripts and earnings presentations; media and analyst reports concerning ZoomInfo; and other publicly available documents concerning ZoomInfo. Plaintiffs' information and belief also is based on its attorneys' extensive review of documents publicly filed in *State Teachers Retirement System of Ohio, et al. v. ZoomInfo Technologies, Inc., et al.*, No. 3:24-cv-05739-TMC (W.D. Wash.) (the "Class Action"), including the Court's October 28, 2025 Order denying in part Defendants' motion to dismiss the Class Action (the "Class MTD Order"). Plaintiffs' information and belief also is based on discussions with percipient witnesses who worked for ZoomInfo during the relevant time period, as discussed in more detail below. Plaintiffs believe that—having conducted a reasonable inquiry under the circumstances—the factual contentions in this Complaint either have evidentiary support or likely will have evidentiary

COMPLAINT AND JURY DEMAND - 3

support after a reasonable opportunity for further investigation or discovery, and that their claims are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.

## NATURE OF THE ACTION

1. This is an action to recover significant investment losses suffered as a result of Defendants misleading the investing public that ZoomInfo was experiencing strong, sustainable growth when, in fact, its growth was built on subscriptions sold to customers who had never been vetted for creditworthiness, were increasingly delinquent or non-paying, and were being kept on the books through coercive auto-renewal practices rather than genuine demand.

2. ZoomInfo is a technology company offering digital sales and marketing tools to businesses. Its flagship product, "SalesOS," is a commercial database providing sales and marketing professionals with organizational and contact information about prospective customers. ZoomInfo's subscription revenue accounts for nearly 100% of its revenue.

3. Because its revenue is contract-based, analysts and investors focused on a revenue-derived metric called "remaining performance obligations" or "RPO" in assessing ZoomInfo's value. RPO was treated by the market as a proxy for annual contract value and for the durability of ZoomInfo's subscription base. It was understood to be the best indicator of how well existing customers were being retained by ZoomInfo and was considered to be a good indicator of the health of the business.

4. Unbeknownst to investors, however, a substantial and growing share of ZoomInfo's reported RPO was inflated because of a fraudulent scheme orchestrated by Defendants. Defendants' scheme rested on four interlocking artifices: (a) selling ZoomInfo subscription contracts to unvetted customers without any due diligence into their likelihood of nonpayment; (b) overstating ZoomInfo's RPO by failing to account for customers' likelihood of nonpayment and known collectability problems; (c) further inflating RPO by declining to write down bad debts that were known to be uncollectable, instead allowing delinquent accounts to remain on the books—in

COMPLAINT AND JURY DEMAND - 4

some cases for up to 360 days—while still counting them toward reported RPO and revenue; and (d) once demand began to soften in 2021, trapping existing customers in coercive automatic renewals structured to defeat their ability to opt out, and counting those forced renewals as revenue rather than disclosing them as "churn."

5. Multiple former ZoomInfo employees have corroborated each element of this scheme from first-hand knowledge of ZoomInfo's sales practices, its internal account-health tracking systems, its accounting treatment of delinquent receivables, and its coercive renewal tactics.

6. While Defendants concealed these facts from the market, Defendant Schuck personally sold 21,617,859 shares of ZoomInfo stock for proceeds of approximately $1.1 billion; Defendant Hyzer sold 609,343 shares for proceeds exceeding $35 million; and Defendant Hays sold more than 1,154,296 shares for proceeds nearly $66 million.

7. Ultimately, Defendants' fraud unraveled through a series of partial disclosures between November 2022 and August 2024, each of which caused ZoomInfo's stock price to fall sharply. This culminated in the Company's August 5, 2024 disclosure of a $33 million bad-debt charge tied to customer non-payment and a shift to requiring pre-payment from smaller customers. By that date, ZoomInfo stock had fallen from a high of $77.35 per share to $8 per share—a decline of 90%.

8. These facts are not merely alleged in the abstract. In its October 28, 2025 Order granting in part and denying in part Defendants' motion to dismiss in the Class Action, the Court found—on a fully briefed motion testing substantially identical allegations to those in this Complaint—that the operative complaint adequately pled: (a) actionable false and misleading statements regarding ZoomInfo's inflated RPO; (b) "maker" liability under Rule 10b-5(b) as to Defendants ZoomInfo, Schuck, and Hyzer; (c) scheme liability under Rule 10b-5(a) and (c) as to Defendants ZoomInfo, Schuck, Hyzer, and Hays; and (d) a strong inference of scienter as to ZoomInfo, Schuck, Hyzer, and Hays based on a holistic review of former-employee accounts,

COMPLAINT AND JURY DEMAND - 5

core-operations allegations, internal controls certifications, and an admission by ZoomInfo's new CFO. The Court separately held that Plaintiffs adequately pled reliance, economic loss, and loss causation, and sustained a Section 20(a) control-person claim against Schuck, Hyzer, and Hays.

9. Plaintiffs suffered significant investment losses based on purchases of stock they made during the period that Defendants were concealing the truth from the market. Plaintiffs bring this action under the federal securities laws and the common law to recover the investment losses they suffered as a result of Defendants' fraud.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

11. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same case or controversy.

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District. ZoomInfo has its principal place of business in this District and Defendants committed tortious acts and transacted business in this District.

13. In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

COMPLAINT AND JURY DEMAND - 6

**PARTIES**

**I.    Plaintiffs**

14.    Plaintiff Advanced Series Trust is a Massachusetts business trust and includes, *inter alia*, the following series and portfolios:  AST Balanced Asset Allocation Portfolio; AST Large-Cap Growth Portfolio; AST J.P. Morgan Aggressive Multi-Asset Portfolio; AST PGIM Aggressive Multi-Asset Portfolio; and AST Small-Cap Equity Portfolio.  The dates on which Plaintiff Advanced Series Trust purchased ZoomInfo common stock, through these series and portfolios, during the relevant period are set forth in Exhibit A.

15.    Plaintiff The Prudential Series Fund is a statutory trust and includes, *inter alia*, the following portfolios:  PSF PGIM Jennison Focused Blend Portfolio; and PSF PGIM Jennison Growth Portfolio.  The dates on which Plaintiff The Prudential Series Fund purchased ZoomInfo common stock, through these portfolios, during the relevant period are set forth in Exhibit B.

16.    Plaintiff Prudential's Gibraltar Fund, Inc. is an open-end, diversified management investment company.  The dates on which Plaintiff Prudential's Gibraltar Fund, Inc. purchased ZoomInfo common stock during the relevant period are set forth in Exhibit C.

17.    Plaintiff Prudential Jennison Small Company Fund, Inc. is a diversified open-end management investment company that includes, *inter alia*, its series PGIM Jennison Small Company Fund.  The dates on which Plaintiff Prudential Jennison Small Company Fund, Inc. purchased ZoomInfo common stock, through its series PGIM Jennison Small Company Fund, during the relevant period are set forth in Exhibit D.

18.    Plaintiff Prudential Jennison Mid-Cap Growth Fund, Inc. is a diversified open-end management investment company that includes, *inter alia*, its series PGIM Jennison Mid-Cap Growth Fund.  The dates on which Plaintiff Prudential Jennison Mid-Cap Growth Fund, Inc. purchased ZoomInfo common stock, through its series PGIM Jennison Mid-Cap Growth Fund, during the relevant period are set forth in Exhibit E.

COMPLAINT AND JURY DEMAND - 7

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

19. Plaintiff Prudential Investment Portfolios, Inc. is a corporation that includes, *inter alia*, its series PGIM Jennison Growth Fund. The dates on which Plaintiff Prudential Investment Portfolios, Inc. purchased ZoomInfo common stock, through its series PGIM Jennison Growth Fund, during the relevant period are set forth in Exhibit F.

20. Plaintiff Prudential Investment Portfolios 2 is a statutory trust that includes, *inter alia*, its series PGIM Quant Solutions Mid-Cap Index Fund and PGIM Quant Solutions U.S. Broad Market Index. The dates on which Plaintiff Prudential Investment Portfolios 2 purchased ZoomInfo common stock, through its series PGIM Quant Solutions Mid-Cap Index Fund and PGIM Quant Solutions U.S. Broad Market Index, during the relevant period are set forth in Exhibit G.

21. Plaintiff Prudential Investment Portfolios 3 is a statutory trust that includes, *inter alia*, its series PGIM Jennison Focused Growth Fund. The dates on which Plaintiff Prudential Investment Portfolios 3 purchased ZoomInfo common stock, through its series PGIM Jennison Focused Growth Fund, are set forth in Exhibit H.

22. Plaintiff Prudential Investment Portfolios 5 is a statutory trust that includes, *inter alia*, its series PGIM Jennison Diversified Growth Fund. The dates on which Plaintiff Prudential Investment Portfolios 5 purchased ZoomInfo common stock, through its series PGIM Jennison Diversified Growth Fund, are set forth in Exhibit I.

23. Plaintiff Prudential World Fund, Inc. is a corporation that includes, *inter alia*, its series PGIM Jennison NextGeneration Opportunities Global Fund. The dates on which Plaintiff Prudential World Fund, Inc. purchased ZoomInfo common stock, through its series PGIM Jennison NextGeneration Opportunities Global Fund, during the relevant period are set forth in Exhibit J.

24. At all relevant times, Jennison Associates LLC ("Jennison") acted as investment adviser to Plaintiffs in connection with their purchases of ZoomInfo common stock.

COMPLAINT AND JURY DEMAND - 8

## II.    Defendants

25.    Defendant ZoomInfo is a Delaware corporation headquartered in Vancouver, Washington.  ZoomInfo's Class A common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the symbol "GTM" (and, prior to May 2025, under the symbol "ZI").

26.    Defendant Henry Schuck is the Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Chairman") of ZoomInfo.  Schuck participated in media interviews, earnings calls, and analyst conferences during which he made the statements about ZoomInfo's customer retention and RPO alleged herein, and he signed ZoomInfo's annual and quarterly SEC filings containing the challenged financial figures. During the relevant period, Schuck sold 21,617,859 shares of ZoomInfo stock for proceeds of approximately $1.1 billion.

27.    Defendant Cameron Hyzer served as Chief Financial Officer ("CFO") of ZoomInfo from November 2018 until his departure in October 2024, which was announced on August 5, 2024.  As CFO, Hyzer led ZoomInfo's accounting, finance, internal audit, SEC reporting, and tax/treasury functions, participated in earnings calls and analyst conferences, and signed ZoomInfo's SEC filings.  During the relevant period, Hyzer sold 609,343 shares of ZoomInfo stock for proceeds exceeding $35 million.

28.    Defendant Joseph Christopher Hays was ZoomInfo's President and Chief Operating Officer, responsible for sales development.  Hays suppressed information showing ZoomInfo was falling behind its competitors and losing market share, and directed the Company's coercive renewal practices.  During the relevant period, Hays sold more than 1,154,296 shares of ZoomInfo stock for nearly $66 million.

29.    Defendants Schuck, Hyzer, and Hays are referred to collectively in this Complaint as the "Individual Defendants."

## III.    Confidential Witnesses

30.    Numerous confidential witnesses have confirmed that ZoomInfo and its executives were engaged in a long-running fraud.

COMPLAINT AND JURY DEMAND - 9

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

31.    On April 1, 2025, the Lead Plaintiff in the Class Action filed its Corrected Amended Complaint for Violations of the Federal Securities Laws ("Class Complaint"). Per that complaint, counsel for the Lead Plaintiff in the Class Action conducted an extensive investigation into misconduct at ZoomInfo, which included interviewing former ZoomInfo employees with relevant knowledge. Those former employees are described in the Class Complaint as follows:

a. "FE-1" was employed by ZoomInfo as a Manager, Sales UK & EMEA from July 2022 until January 2024, responsible for a sales team of six to eight representatives focused on SMB and Mid-Market customers. FE-1 reported to Director, Sales Ryan Oosterveld and former SVP, International Revenue & Emerging Products Ray Mariano Jr.

b. "FE-2" was employed by ZoomInfo as a Senior Sales Manager, Mid-Market from July 2018 to December 2019 and as a Sales Director from January 2020 to November 2021, overseeing sales teams of six to ten representatives responsible for driving new business in the United States.

c. "FE-3" was employed by DiscoverOrg, and subsequently ZoomInfo, as a Revenue Accountant before and throughout the relevant period. FE-3's role involved working on complex revenue issues, including contract modifications, and FE-3 attended meetings with a consulting firm ZoomInfo engaged to advise on the Company's problems applying the variable constraint required by ASC 606.

d. "FE-4" was employed by ZoomInfo as a Senior Account Executive from October 2019 through March 2024, transitioning in mid-2023 to an Account Management role focused on Commercial customers. FE-4 recalled quarterly All Hands Meetings led by Defendants Schuck and Hyzer that served as a "State of the Union" on customer account health.

e. "FE-5" began at ZoomInfo as a New Business Inbound SDR in October 2022, responsible for customers across Enterprise, Mid-Market, and SMB segments;

COMPLAINT AND JURY DEMAND - 10

transitioned to a Customer Inbound SDR in May 2023; and joined the Renewals Support Team in September 2023, remaining there through July 2024.

f.  "FE-6" was employed by ZoomInfo in a senior leadership capacity within the Company's Account Management function, responsible for renewing and cross-selling to existing clients across geographies and customer segments, from prior to November 10, 2020 until four quarters before August 5, 2024.

g.  "FE-7" was employed by ZoomInfo as an Enterprise Account Executive from November 2020 until September 2023, reporting up a chain that ultimately reached former Chief Revenue Officer Dave Justice (and, before him, Tim Strickland and Defendant Hays) and Defendant Schuck.  FE-7 was a member of the "Retain and Grow" group responsible for Enterprise customers.

h.  "FE-8" was employed by ZoomInfo as a Customer Success Manager from December 2021 until September 2024.  FE-8 personally tallied or computed the risk scores for her accounts, considering multiple factors including conversations with customers.

i.  "FE-9" was employed by ZoomInfo as a Senior Account Executive, Talent Solutions from July 2022 until January 2023, having previously worked at Comparably (a company ZoomInfo acquired in 2022) from January 2021 until the acquisition.

j.  "FE-10" was employed by ZoomInfo in a variety of roles from June 2018 until March 2023—Client Success Specialist, Enterprise Customer Success Manager, and finally Revenue Operations Product Manager—reporting up a chain that included former Chief Business Officer Scott Sutton, who reported to Defendant Hays.

k.  "FE-11" was employed in ZoomInfo's Marketing Department for over three quarters during 2021.  FE-11 attended meetings every Thursday with Defendant

COMPLAINT AND JURY DEMAND - 11

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

Hays and former Chief Marketing Officer Shane Murphy-Reuter to discuss demand-generation status updates, and had additional meetings with Defendant Hays, Murphy-Reuter, and Defendant Schuck every few weeks.

l. "FE-12" was employed by ZoomInfo from June 2022 until December 2023, including as a Sales Development Representative, and was able to view account-health metrics in Salesforce before contacting customers.

m. "FE-13" was employed by DiscoverOrg when it acquired ZoomInfo. FE-13 was Vice President, Customer Expertise – Head of Customer Onboarding and Education from September 2019 to March 2023. FE-13 was responsible for various customer-related functions. FE-13 reported to ZoomInfo's Chief Customer Officer, Dominic Constandi, who reported to Defendant Hays.

32. In this Complaint, Plaintiffs retain the "FE" nomenclature the Class Complaint used to refer to these former employees.

33. In addition to reviewing the factual investigation conducted in the Class Action, Plaintiffs' counsel independently investigated the allegations in this Complaint, including by directing and supervising its own private investigator who interviewed former employees of ZoomInfo.

34. Plaintiffs' investigation confirmed the substance of several of the Class Action's FEs' allegations as described in the Class Complaint, as well as identifying additional detail corroborating those accounts, as further described below.

35. Plaintiffs' investigation also identified four additional confidential witnesses with independent, first-hand knowledge relevant to the allegations in this Complaint.

36. These four former employees, all of whom had first-hand knowledge of various aspects of the fraudulent schemes, are referred to herein with the abbreviation "CW" (for Confidential Witness) and a number to protect their confidentiality.

COMPLAINT AND JURY DEMAND - 12

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

37.    "CW-1" was employed by ZoomInfo in its Marketing Department as a Strategic Campaign Specialist II – Revenue Generation and Campaign Manager from June 2021 to June 2023, a position that also touched on sales-facing initiatives.

38.    "CW-2" was employed by ZoomInfo as an Account Manager, working remotely, from March 2022 to February 2023, including on a team responsible for proactive outreach to customers approaching automatic renewal.

39.    "CW-3" was employed by ZoomInfo in its Accounting Department, working remotely, from November 2022 to June 2024, including as a Contract Accounting Analyst and, later, a Revenue Accountant on ZoomInfo's revenue-recognition team.  CW-3 personally participated in the write-off of long-delinquent customer accounts.

40.    "CW-4" was employed by ZoomInfo as an Account Executive, working remotely, from February 2023 to September 2024, first covering small-business accounts and later covering larger commercial and mid-market accounts.

## FACTUAL ALLEGATIONS

### I.    ZoomInfo's Origins and Business

41.    ZoomInfo is a technology company offering digital sales and marketing tools to businesses.

42.    ZoomInfo's predecessor, DiscoverOrg, was co-founded by Defendant Schuck in 2007.

43.    On February 4, 2019, DiscoverOrg acquired its competitor, Zoom Information, Inc. A few months later, the Company rebranded as ZoomInfo.

44.    ZoomInfo's flagship product, SalesOS, is a commercial database providing sales and marketing professionals with organizational and contact information about prospective customers.

45.    ZoomInfo's customers fall into three broad categories:  Enterprise, Mid-Market, and small-to-medium business ("SMB").

COMPLAINT AND JURY DEMAND - 13

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

46.     Subscription revenue accounts for nearly 100% of the Company's revenue.

47.     ZoomInfo became a publicly traded company in June 2020.

48.     Under the regulations and guidance promulgated by the SEC, companies whose stock is publicly traded in the United States—such as ZoomInfo—have important public reporting and disclosure obligations.

49.     Public companies are required to file with the SEC certain disclosure documents containing comprehensive information about their business operations and financial condition. Investors generally rely on the accuracy and transparency of these disclosures—as well as other public statements made by the company—when determining whether to invest.

50.     In conjunction with their quarterly filings with the SEC, most public companies (including ZoomInfo) publish "earnings releases" (written press releases summarizing their quarterly results and performance) and hold public "earnings calls," which are accessible to all members of the public, to discuss the quarterly results and the company's performance with analysts and investors.

51.     To ensure the accuracy of their financial disclosures, the CEO and CFO of a public company are required to certify them.  Specifically, Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX") requires the CEO and the CFO to certify that the information in each periodic report containing financial statements filed with the SEC "fairly presents, in all material respects, the financial condition and results of operations" of the company.

52.     As a publicly traded corporation with significant operations in the U.S., ZoomInfo was at all relevant times required to prepare its financial statements in accordance with United States Generally Accepted Accounting Principles ("GAAP") in order for those financial statements not to be deemed misleading and inaccurate.  GAAP is a set of rules and standards that are designed to ensure uniform financial reporting.

53.     The SEC relies on the Financial Accounting Standards Board ("FASB") to adopt GAAP rules applicable to public companies.

COMPLAINT AND JURY DEMAND - 14

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

54.     FASB created the Accounting Standards Codification ("ASC") to provide a single source of GAAP.

55.     Accounting Standards Update No. 2014-09, Revenue from Contracts with Customers (Topic 606) is the principal GAAP that applies to ZoomInfo's relevant accounting issues ("ASC 606").

56.     ASC 606 requires a company to perform a robust assessment of its likelihood of collecting on its contracts.  As part of an initial contract review prior to day one of the contract's inception, a company must evaluate the total consideration (i.e., dollars) that are probable to be received.  An improper overestimation of total consideration expected to be received over the life of the contract can result in an overstatement of revenue and other revenue-related metrics.

57.     Public companies are required to follow the standards developed by the SEC governing what information must be disclosed to investors.  Material information provided to investors must be true and accurate.  SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) prohibits a company from making materially false or misleading statements in connection with the purchase and sale of its securities.

58.     Public companies also are required to maintain effective internal controls of financial reporting as well as effective disclosure controls and procedures.  An issuer's top-ranking executives must be involved in creating and designing these controls, and also must personally guarantee their effectiveness.

59.     The Committee of Sponsoring Organizations of the Treadway Commission's *Internal Control – Integrated Framework* defines internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting and compliance."  With respect to the reporting and compliance aspects of this definition, the *Integrated Framework* specifically states that "[w]hen internal control is determined to be effective, senior management and the board of directors have reasonable assurance [that] . . . the

COMPLAINT AND JURY DEMAND - 15

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

organization prepares reports in conformity with applicable laws, rules and regulations, and standards established by legislators, regulators, and standard setters, . . . [and that] the organization complies with applicable laws, rules and regulations." *See* The Committee of Sponsoring Organizations of the Treadway Commission's *Internal Control – Integrated Framework* § 3 ("Requirements for Effective Internal Control").

60.     Section 404 of SOX requires public companies to publish information in their annual reports concerning the scope and adequacy of their internal control structure and procedures for financial reporting, and also to assess the effectiveness of such internal controls and procedures. In its interpretative guidance issued for the rules promulgated to implement Section 404, the SEC instructed that "management should evaluate whether it has implemented controls that adequately address the risk that a material misstatement of the financial statements would not be prevented or detected in a timely manner. [This involves] a top-down, risk-based approach . . . , including the role of entity-level controls in assessing financial reporting risks and the adequacy of controls." *Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934*, Exchange Act Release No. 55929, § I (June 20, 2007). When management identifies a control deficiency, it cannot claim that its internal controls are effective if the control deficiency is deemed to be a material weakness.

61.     Section 302 of SOX requires a public company's chief executive officer and chief financial officer to provide certifications concerning their review of, and disclosure of information about, the company's internal controls. Specifically, pursuant to rules promulgated by the SEC to implement Section 302 of SOX, the CEO and CFO are required to certify in each periodic report that:

- he or she has reviewed the report;

- based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the

COMPLAINT AND JURY DEMAND - 16

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

circumstances under which such statements were made, not misleading with respect to the period covered by the report;

- based on his or her knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in the report;

- he or she and the other certifying officers:

  o are responsible for establishing and maintaining "disclosure controls and procedures" [i.e., controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms] for the issuer;

  o have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which the periodic report is being prepared;

  o have evaluated the effectiveness of the issuer's disclosure controls and procedures as of a date within 90 days prior to the filing date of the report; and

  o have presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on the required evaluation as of that date;

- he or she and the other certifying officers have disclosed to the issuer's auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function):

  o all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

  o any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

- he or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

COMPLAINT AND JURY DEMAND - 17

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

*Certification of Disclosure in Companies' Quarterly and Annual Reports*, Exchange Act Release 46427, § II.A (Sept. 9, 2002) (footnotes omitted).

## II. Defendants Assure the Market That ZoomInfo Is Experiencing Stable Growth Based on Its Reported "RPO"

62. Throughout the relevant period, Defendants purported to comply with these standards and represented to investors, including Plaintiffs, that ZoomInfo was experiencing strong, sustainable growth in customers and revenue.

63. Financial analysts who covered ZoomInfo's stock focused on Remaining Performance Obligations ("RPO").

64. RPO represents the aggregate value of all outstanding contracts the Company has not recognized revenue for yet.

65. ZoomInfo reported RPO to investors on a quarterly basis and included it as part of its income statement.

66. RPO was crucial to analysts and the investing public because it gave insight into the revenue that ZoomInfo stood to collect on subscription contracts.

67. Investors understood RPO to be a meaningful "proxy" of ZoomInfo's growing annual contract value, or "ACV" and, therefore, reflective of positive company health.

68. In addition to reporting ZoomInfo's RPO metrics, Defendants also made related statements about the sustainability of the demand the Company was experiencing and ZoomInfo's ability to retain customers.

69. For example, on February 15, 2022, Defendant Schuck assured investors that ZoomInfo was experiencing sustained demand, and not just a one-time "pull forward" caused by COVID. He stated:

> [W]e're constantly looking at the data, the historical data. We look at win rates, funnel conversion, top of funnel activity. And we spent a real amount of time looking for anomalies that we could tie back to some relation to COVID. And we didn't see anything that [would cause us to] believe that the current strong demand trends we're seeing wouldn't continue or one-offy or a pull-forward. And we wanted to be confident about that because it would affect the way

COMPLAINT AND JURY DEMAND - 18

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

we operate the business.  We didn't see any anomalies like that that made us think that COVID caused a pull-forward in the demand environment that we're seeing today wouldn't continue.

70.    Defendants also told investors that ZoomInfo was successfully retaining customers, which was an indication of sustainable growth.

71.    Even as the Company was beginning to report some indicators of a slowdown, Defendants told investors that this was due to macroeconomic factors and not something relating to the Company's ability to retain customers based on its own practices.

72.    For example, in July 2023, Defendant Schuck assured the market that, overall, the Company was retaining customers, stating:  "[W]e're keeping those customers, but we're seeing the renewals being more challenging."

### III.    Prior to ZoomInfo's IPO, Schuck Directed ZoomInfo to Sign Up Customers Without Regard to Their Ability to Pay

73.    ZoomInfo went public on June 4, 2020, selling 44.5 million shares at $21 per share and raising approximately $1 billion.  By November 2021, ZoomInfo's stock had climbed to almost $75 per share—almost tripling its IPO price—driven by a sales strategy that, as alleged below, had abandoned any meaningful vetting of customer creditworthiness.

74.    Leading up to ZoomInfo's IPO, Schuck personally directed employees to sell to as many customers as possible for the express purpose of increasing the Company's pre-IPO stock price.  The FEs interviewed in the Class Action confirmed that Schuck coupled this directive with ZoomInfo's decision not to perform due diligence into its customers' ability to pay.  (Class Compl. ¶ 113.)

75.    Schuck told employees that the Company needed "all-hands-on-deck" to sign up as many customers as possible, and ZoomInfo distributed equity to employees to incentivize new customer sign-ups.  (Class Compl. ¶ 114.)

76.    As part of ZoomInfo's aggressive push to increase sales and inflate the price of ZoomInfo stock, the Company did not perform due diligence into new customers' ability to pay when closing their contracts.

COMPLAINT AND JURY DEMAND - 19

77.     FEs interviewed in the Class Action confirmed that this decision led to large numbers of customer subscriptions—disproportionately within ZoomInfo's SMB and Mid-Market segments—carrying a high likelihood of nonpayment, and that ZoomInfo frequently allowed customers posing a high collectability risk to begin using ZoomInfo immediately, without tendering payment, forcing ZoomInfo's accounting department to recognize revenue the Company knew it was unlikely to collect.  (Class Compl. ¶ 119.)

78.     According to FE-1, a former Sales Manager, "there were no discussions around due diligence and vetting prospective customers."  Unlike similar companies she had previously worked for, ZoomInfo did not have credit checks for new customers; "the mentality was 'get it done, we'll deal with [any problems] later.'"  (Class Compl. ¶ 120.)

79.     According to FE-3, there were "no barriers" and "no constraints" placed on the Sales Team regarding potential customers, including "not requiring upfront payment from customers, and not requiring more than a business name and a business address to get a deal signed." As FE-3 explained:  "The entire length of the company, a decade, the entire thing is just sell—just sell, get that deal signed.  Does it mean we're going to collect the money?  No.  That's what was happening at a large scale here.  But it got out of control."  (Class Compl. ¶ 122.)

80.     Despite this, ZoomInfo's accountants "technically recognize[d] the deal as revenue because it's on paper and there was a 'contract.'" (Class Compl. ¶ 125.)

81.     As the COVID-19 pandemic accelerated, many small and midsize businesses obtained temporary funding, including federal Paycheck Protection Program ("PPP") loans, to accommodate a shift to virtual work and volatile market conditions.

82.     This led to skyrocketing demand for digital sales and marketing tools, resulting in more unverified customer sign-ups, which Defendants knew were both driven by temporary demand and saturated with financial risk, and would not continue to generate the stable revenue growth ZoomInfo portrayed to investors.

COMPLAINT AND JURY DEMAND - 20

83.     According to FE-13, over time, as employees returned to the office and many ZoomInfo customers lost funding or went out of business, this risk materialized.  (Class Compl. ¶ 130.)

84.     Plaintiffs' independent investigation confirms and supplements these allegations. FE-2, who managed a first-line sales team of six to ten representatives responsible for new U.S. business, confirmed to Plaintiffs' investigator that "very shortly" after DiscoverOrg's February 2019 acquisition of ZoomInfo, the Company "let us know the plan is to IPO" and would "now accelerate everything"—"that's when the pressure started heating up."

85.     FE-2 further confirmed to Plaintiffs' investigator that Schuck told employees at monthly meetings that the Company needed "all hands on deck" to sign up as many customers as possible, and that in the month before the IPO, ZoomInfo began distributing equity broadly to employees who had not previously received it, in order to incentivize them to sign up new customers.

86.     FE-2 further confirmed that ZoomInfo hired approximately 1,000 additional salespeople in 2020 and implemented a "meritocracy-style lead distribution system" under which representatives whose deal-close ratios fell below a threshold were assigned progressively lower-quality leads and, if unable to close those leads, were terminated—a dynamic FE-2 described as turning the sales department into a "boiler-room" environment, with public leaderboards displaying underperforming representatives on office television screens.

87.     FE-2 independently confirmed to Plaintiffs' investigator that ZoomInfo conducted no due diligence on prospective customers' creditworthiness before signing them to contracts, which FE-2 described as unusual compared to other companies at which FE-2 had worked, where customers were vetted for a profile likely to "stay with us long-term."  At ZoomInfo, by contrast, "it was expected that you were to close every lead that you had."

COMPLAINT AND JURY DEMAND - 21

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

**IV.    ZoomInfo Materially Overstated Its RPO in Violation of ASC 606**

88.    Financial analysts covering ZoomInfo focused on RPO as a proxy for annual contract value because it showed that existing customers were being retained and provided insight into the health of the business.

89.    Although ZoomInfo was required to comply with GAAP when reporting RPO, the Company failed to perform a robust assessment of its likelihood of collecting on its contracts. Under ASC 606, ZoomInfo was required, as part of an initial contract review prior to day one of the contract's inception, to evaluate the total consideration that was probable to be received.

90.    However, ZoomInfo did not even have a variable constraint model in place to assess collectability, and thus overestimated the total consideration of its contracts, reporting inflated RPO and revenue figures.

91.    Defendants further inflated RPO by not writing down bad debt for accounts that Defendants knew to be uncollectable or delinquent, instead counting revenue from accounts hundreds of days in delinquency in ZoomInfo's RPO figures.

92.    According to FE-3 in the Class Action, delinquent accounts were kept on the books as long as 360 days before being written off as uncollectable.  (Class Compl. ¶¶ 141, 310.)

93.    CW-2 independently confirmed this practice to Plaintiffs' investigator and provided a concrete example based on CW-2's personal observation.

94.    CW-2 recalled that ZoomInfo's revenue projections were "based off auto-renewals that didn't happen" and, more specifically, that when a customer extended its contract for a limited period—for example, three months—at a prorated rate rather than renewing for a full twelve-month term, ZoomInfo would nonetheless "capture the sale as if it was 12 months" in its revenue-projection reporting (which CW-2 believed was generated in Salesforce), even in instances where the customer in fact canceled at the end of the short extension.

95.    CW-2 raised this concern to CW-2's manager, stating that ZoomInfo's method of predicting revenue "made no sense," and recalled that ZoomInfo "wanted people who didn't ask questions."

COMPLAINT AND JURY DEMAND - 22

96.     CW-2 separately recalled an instance in which an account with a $0 balance was nonetheless auto-renewed by ZoomInfo, which CW-2 was told to characterize internally as a "donation."

97.     CW-3, who worked on ZoomInfo's revenue-recognition team within the Accounting Department, independently confirmed to Plaintiffs' investigator the absence of a variable constraint model and the Company's failure to timely write off delinquent accounts, providing extensive first-hand detail.

98.     CW-3 confirmed that ZoomInfo's Accounts Receivable team's collection timeline was "ridiculously long," that a "lot of time they never collected," and that the Company would "have to do all sorts of write-offs for stuff," with accounts 120 days past due carrying a chance of collection CW-3 estimated as "probably zero."

99.     CW-3 further confirmed that collectability was a "big focus" internally because there was "so much uncollected money," and confirmed the existence of aging buckets in 30-day increments, with accounts becoming much more concerning after 60 days delinquent.

100.    CW-3 was personally "part of the write-off team" and would "go through and see accounts a year past due."

101.    CW-3 also confirmed that ZoomInfo's roughly $15,000-$20,000 average contract size would ordinarily call for upfront payment, but that ZoomInfo's accounting personnel nonetheless had to recognize such contracts as revenue because they were memorialized on paper as a contract, notwithstanding widely shared internal skepticism.

102.    CW-3 recalled that, later in the relevant period, ZoomInfo changed its revenue-recognition threshold so that smaller contracts—anything under $5,000—would be "recognized immediately" upon signing. This constituted a change from a prior, higher threshold that CW-3 believed was around $15,000. When asked why the change was made, CW-3 said: "I think in response to the issues you're talking about"—that is, in response to the Company's mounting collectability problems.

COMPLAINT AND JURY DEMAND - 23

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

103.    CW-3 also confirmed that ZoomInfo did not conduct credit checks on prospective customers and confirmed this was "absolutely" connected to the Company's aggressive sales culture.

104.    CW-3 was approached by ZoomInfo salespeople seeking approval for small, high-risk deals—for example, "a small company where it was two guys in a shed" seeking $15,000 worth of licenses on 120-day payment terms—under pressure tied to quarterly sales deadlines ("It's the end of the quarter; can we get this deal approved?").  CW-3 confirmed that such deals were "usually" approved regardless of the customer's creditworthiness.

105.    CW-4, an Account Executive who personally enrolled about two hundred companies as ZoomInfo customers, independently confirmed to Plaintiffs' investigator the absence of any credit checks.

106.    CW-4 explained that companies with more than one employee were "given access immediately" upon agreeing to a contract, and that ZoomInfo's only check was to confirm the customer had formed an LLC or S-corporation—a formality CW-4 said sales personnel routinely found "workarounds" for when a prospective customer had not yet done so.

107.    CW-4 further stated that "at the end of the quarter, there were some pushes to get around" even that minimal check, driven by different vice presidents at the Company.

108.    CW-4 also independently confirmed to Plaintiffs' investigator that ZoomInfo did not require upfront payment except for single-seat purchases.

109.    CW-4 separately described a specific practice through which ZoomInfo perpetuated its cycle of non-paying customers:  when a customer that had stopped paying—for example, one that owed $20,000—had its account canceled and later sought to re-enroll, ZoomInfo would "write off the previous balance" and accept a small fraction of the amount owed (for example, $5,000) in exchange for treating the remaining delinquent balance as settled without ever requiring payment of the original past-due balance.

COMPLAINT AND JURY DEMAND - 24

110. CW-4 could not recall a single instance in which a re-enrolling customer was required to pay its full outstanding balance before regaining access to ZoomInfo's products.

## V. Internal Metrics Confirmed Declining Demand and Collectability Problems, Which Defendants Publicly Concealed

111. By 2021, it became apparent to those inside ZoomInfo that the Company's financial condition and market position were worsening.

112. According to the Class Complaint, FE-11 attended weekly meetings with Hays and Chief Marketing Officer Shane Murphy-Reuter to discuss demand-generation status updates, and commissioned a marketing survey comparing ZoomInfo's features to its competitors, including data quality and ease of use.

113. The survey showed ZoomInfo's competitors were performing better than previously believed and, in some areas, had even surpassed ZoomInfo—for example, "ZoomInfo no longer [had] the best data when previously, as DiscoverOrg, their data quality was what set them apart." FE-11 expressed that the survey showed ZoomInfo's "gravy train of growth" was slowing, and that the "hyper growth" the Company had experienced was not going to last and needed to be acknowledged—but ZoomInfo executives "buried" the news "because it did not tell the story they wanted to tell." (Class Compl. ¶¶ 159-60, 437-38.)

114. CW-1 independently confirmed to Plaintiffs' investigator, from personal knowledge in a marketing role touching sales-facing initiatives, that ZoomInfo commissioned a survey of several thousand users, conducted with an outside vendor, comparing ZoomInfo to its competitors on data quality, ease of use, and related features, and that the survey's results showed the competitive gap was not as large as ZoomInfo believed—with certain competitors having surpassed ZoomInfo in some respects.

115. Meanwhile, ZoomInfo's internal tracking systems confirmed that fewer customers were actually using ZoomInfo's platform. According to multiple FEs in the Class Action, senior leadership reviewed figures from platforms like Gainsight and Salesforce that "sent an unmistakable signal to Defendants that declining usage rates and collectability challenges were

COMPLAINT AND JURY DEMAND - 25

occurring in droves." Specifically, every account had its own Health Score, color-coded red, yellow, or green, based on the number of active licenses and "customer sentiment," a field manually input by representatives based on conversations with customers. (Class Compl. ¶¶ 171-74, 439-42.)

116. According to the Class Complaint, FE-8, a former Customer Success Manager, recalled that Gainsight housed information on all of ZoomInfo's customer accounts, that usage metrics flowed directly from customers' platforms into Gainsight and Salesforce, and that she herself "tallied" the risk scores in her own role. FE-12 similarly recalled reviewing account-health metrics in Salesforce before contacting customers. (Class Compl. ¶¶ 441-42.)

117. According to the Class Complaint, Schuck and Hyzer presented the color-coded scores in internal meetings. FE-4 recalled quarterly "All Hands Meetings" led by Schuck and Hyzer that served as a "State of the Union" on customer account health, including a "color coded box sequence" with "green fading into yellow, fading into red." Based on the status displayed, FE-4 thought to herself that account health was "not where [ZoomInfo] wanted to be," recalling customers with five to ten licensed seats where only one or two employees were logging in. FE-4 estimated that 30 to 45 percent of customers were inactive and not logging into their ZoomInfo accounts at all. (Class Compl. ¶¶ 175, 443.)

118. According to the Class Complaint, FE-7 separately explained that low utilization rates were a "clear sign of trouble," and that seeing these figures let her tell whether the New Business group had signed up customers for products they were not going to use. (Class Compl. ¶ 439.)

119. CW-1 agreed that ZoomInfo "scaled too big" following its IPO such that maintaining data quality became more difficult, explaining that going public brought a "huge shift" in which additional internal stakeholders became involved in marketing campaigns, broadening their intended audience and shifting the Company's approach from a targeted, intent-based strategy toward a "throw-a-net-out approach."

COMPLAINT AND JURY DEMAND - 26

120.    CW-1 further confirmed to Plaintiffs' investigator that Schuck was personally aware of ZoomInfo's changing competitive landscape.  CW-1 recalled a conversation with Schuck in or around February 2023, during which CW-1 asked Schuck about the possibility of layoffs given contemporaneous workforce reductions at other technology companies on which ZoomInfo's business heavily depended.

121.    CW-4 independently confirmed to Plaintiffs' investigator that ZoomInfo maintained internal software that displayed a color-coded (green/yellow/red) indicator of each customer's payment status alongside employees' own commission information, with red indicating an account "in collections" that "haven't paid anything."

122.    CW-4 confirmed that this payment-status information was visible enterprise-wide by account, stating, "I could look up anyone at the company, their customers."  CW-4 added that one "could see any company who signed up, if they had paid, if they had not paid."  This corroborates, through an independent and separate internal system, that ZoomInfo's payment and collectability problems were transparent to Company personnel throughout the organization even as Defendants withheld that information from the investing public.

123.    CW-4 also independently confirmed the substance of the market-share erosion described in the Class Complaint's account of FE-13's tenure.  CW-4, who did not overlap with FE-13's employment dates, separately confirmed that ZoomInfo's growth had been driven by a period in which "there was nothing like it in the market," but that competitors emerged offering "essentially the same thing for 1/100th of the price," compounded by the emergence of AI-based alternatives, such that customers increasingly asked ZoomInfo sales representatives "[w]hy would a company spend tens to hundreds of thousands of dollars" with ZoomInfo "when you can get the same data for $1,000 and AI can do the rest of it?"

124.    Thus, Defendants knew that ZoomInfo had two major, undisclosed problems:  (1) the danger of non-payment from risky contracts; and (2) declining genuine demand.  They

COMPLAINT AND JURY DEMAND - 27

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

concealed these problems while continuing to tout illusory successes and inflated RPO figures to the market.

**VI.    Defendants Turned to Coercive Auto-Renewal Tactics to Mask Declining Demand and Manufacture Reportable Revenue**

125.    As genuine demand slowed, ZoomInfo knew it could not sustain demand for its products given the collectability risk and, accordingly, resorted to adhesive auto-renewal provisions in its subscription contracts to force customers to stay with ZoomInfo for another year and continue to prop up sales while Defendants liquidated their personal shares.

126.    ZoomInfo continued to report contracts renewed through these tactics as revenue even though it knew such customers were even less likely to pay for a contract they had no intention of renewing.

127.    Former employees described ZoomInfo engaging in coercive renewal tactics specifically to book such contracts as revenue rather than recording them as "churn"—the industry term for a cancelled or non-renewed subscription.

128.    According to the Class Complaint, FE-6, employed in a senior leadership capacity within ZoomInfo's Account Management function, explained that if a customer expressed they did not want to renew but their opt-out window had already passed, the contract was still counted as revenue on the books rather than as churn.  (Class Compl. ¶ 44.)

129.    FE-11 explained that ZoomInfo's auto-renewal policy was "entrapment" for the customer, and that the Company attempted to bully customers into renewals.

130.    Former employees recalled being instructed to purposefully wait until after the 60-day opt-out window had closed before contacting customers, thereby locking them into another year's commitment.  According to the Class Complaint, FE-10, a former member of the Revenue Operations team, explained that customers were approached only after their opt-out window had closed.  (Class Compl. ¶¶ 46, 180.)

131.    FE-5, a former member of ZoomInfo's Renewals Support Team, recalled that Account Managers instructed her not to contact customers until their contract was 59 days from

COMPLAINT AND JURY DEMAND - 28

ending—one day short of the 60-day opt-out deadline.  FE-5 confirmed the accuracy of this allegation in the Class Complaint to Plaintiffs' investigator.

132.    According to the Class Complaint, FE-12 likewise explained that the opt-out option was not highlighted by ZoomInfo, and that some Account Managers purposely waited to inform customers of the option until it was effectively too late.  (Class Compl. ¶¶ 46, 180.)

133.    FE-10 further recalled—according to the Class Complaint—that ZoomInfo purposely structured its renewal opt-out emails to be caught by customers' spam filters, and that she and her colleagues "felt like they were a collections agency" for customers locked into unwanted renewals.

134.    FE-9 explained that these forced autorenewals were a common reason SMB customers began "ghosting" ZoomInfo—ignoring the Company and not paying their subscription fees.  (Class Compl. ¶ 181.)

135.    Plaintiffs' independent investigation corroborates these allegations from multiple additional sources.  FE-9 independently confirmed that ZoomInfo used aggressive sales tactics to close deals and "dealt with the repercussions after," even when it was apparent the customer was unlikely to pay for the ensuing autorenewal, and confirmed that autorenewals were a common reason SMB customers "ghosted" ZoomInfo and stopped paying.

136.    CW-1 independently confirmed that ZoomInfo's auto-renewal policy amounted to "entrapment" of the customer and that the Company attempted to bully customers into renewing, describing the renewals process generally as "very foggy."

137.    CW-1 also recalled being asked to revise marketing copy for a customer "package upgrade" campaign that pushed existing customers to upgrade their subscriptions to retain certain features, and recalled that other ZoomInfo personnel later revised CW-1's copy to make the campaign more forceful, pushing customers "down a certain path."

138.    CW-2, who worked on a team responsible for proactive renewal outreach, confirmed that if a customer expressed an intent not to renew after the opt-out window had closed,

COMPLAINT AND JURY DEMAND - 29

the contract was still counted as revenue rather than churn.  "Absolutely," as CW-2 put it, adding that she was pressured ("you just got screamed at") to call customers about continuing their ZoomInfo relationship even after they had indicated they did not wish to renew.  CW-2 confirmed that although this practice was not part of her own team's assignment, she observed that other ZoomInfo personnel would "wait until" a client auto-renewed and only then reach out to "upsell them," which CW-2 repeatedly flagged to her manager as "sneaky," describing a "callousness" toward customers whose contracts had been auto-renewed.

139.    In coercing these subscriptions, ZoomInfo "further forestalled the inevitable consequences of its failure to perform due diligence into customers' ability to pay"—locking financially distressed customers into renewals ZoomInfo knew they could not honor, while continuing to count those renewals toward RPO and revenue.  (Class Compl. ¶ 182.)

**VII.    Defendants' Massive, Well-Timed Insider Stock Sales**

140.    Although a lock-up agreement prohibited Defendants from selling their Class A common stock for 180 days after the date of ZoomInfo's IPO, Defendants began selling their shares almost immediately after the lock-up period expired on December 2, 2020.

141.    Defendants adopted Rule 10b5-1 trading plans only after they were already in possession of material, nonpublic information about the unsustainability of ZoomInfo's growth and customer demand.

142.    Schuck adopted his plan prior to November 30, 2020.

143.    On August 6, 2021, with ZoomInfo's stock trading at increased prices (it closed at $66.58 per share on August 5, 2021, a 66% increase from less than a year earlier), ZoomInfo announced that certain selling shareholders—including Schuck, TA Associates, and Carlyle Group—would offer 27 million shares of Class A common stock in an underwritten secondary offering pursuant to a Form S-3 registration statement, at an offering price of $55.25 per share. Because this was a secondary sale of existing insider shares rather than a primary issuance, all proceeds went to the selling shareholders—not to ZoomInfo.

COMPLAINT AND JURY DEMAND - 30

144.    In the resulting secondary offering, the selling shareholders' total proceeds were $1.48 billion—hundreds of millions of dollars more than ZoomInfo itself had raised in its IPO thirteen months earlier.  Schuck (through DO Holdings, which sold 5,920,821 shares, of which 3,286,639 were indirectly held by Schuck) sold at $54.75 per share for over $179.9 million in a single day, outside the parameters of his 10b5-1 plan.

145.    The Company then conducted a second non-dilutive secondary offering.  Schuck sold 2,545,328 shares outside his 10b5-1 plan for $157.8 million, and on September 2, 2021, sold an additional 386,020 shares via an over-allotment option for $23.9 million more.   Hays sold 1,702 shares on September 1 outside his plan ($108,890.66), then 226,000 shares on September 10 and 14 outside his plan (approximately $14.5 million).  Hyzer sold 300,000 shares on September 15 outside his plan (over $20 million).

146.    ZoomInfo's stock reached a high of $77.35 per share on November 17, 2021.  Defendants continued selling: Hyzer sold 15,000 shares that day ($1,150,724.14) and another 15,000 shares on December 17, 2021 ($905,250); Schuck sold 3,727,028 shares throughout November 2021 for $258.9 million; and Hays sold 195,728 shares in November 2021 ($14 million) and 244,659 shares in December 2021 ($15.3 million).

147.    Sales continued through 2022 and 2023, as the Company's public statements grew increasingly at odds with what Defendants knew internally:  from March 18 to June 6, 2022, Schuck sold 1,092,025 shares for over $57 million; from March 18 to October 10, 2022, Hyzer sold 60,000 shares for over $3.3 million; from February 17 to October 3, 2022, Hays sold 199,083 shares for over $8.6 million.

148.    In February 2023, Schuck enacted a new Rule 10b5-1 plan permitting him to sell up to 6 million shares between May and November 2023, and in June 2023 sold 2,083,334 shares for $55 million; from May 3 to July 5, 2023, Hyzer sold 30,000 shares for $740,075.84; and on May 22 and June 20, 2023, Hays sold 60,000 shares for $1.5 million.

COMPLAINT AND JURY DEMAND - 31

149. FE-9 independently recalled to Plaintiffs' investigator that Schuck sold a substantial amount of ZoomInfo stock—describing it as "weird"—followed by a round of company-wide layoffs, which FE-9 also found "really suspicious."

150. FE-9 separately recalled that, within the first few months after ZoomInfo's April 2022 acquisition of FE-9's prior employer, a finance director conducting a headcount review remarked that it was unusual for a billion-dollar company to lack robust financial and headcount oversight, and that the same finance director was tasked with identifying personnel for layoffs in a manner that would avoid drawing media attention.

151. On July 9, 2024, Hyzer sold 7,500 shares for $92,775, bringing his total relevant period insider-sale proceeds to $35,110,546.20.

152. In total, during the relevant period Schuck sold 21,617,859 shares for over $1.1 billion, Hyzer sold 609,343 shares for over $35 million, and Hays sold more than 1,154,296 shares for nearly $66 million.

153. Although many of Defendants' sales were made pursuant to Rule 10b5-1 trading plans, Defendants implemented those plans as part of their scheme and while already in possession of material, nonpublic information about the unsustainability of ZoomInfo's growth—including the undisclosed abandonment of customer due diligence and the directive to inflate RPO. The existence of a 10b5-1 plan therefore does not negate the inference of scienter created by these sales.

154. Hays, in particular, made fifteen insider sales outside his 10b5-1 plan between February 2021 and February 2022, reportedly to cover tax liability associated with vesting securities; even Hays's plan-based sales were implemented, and continued, while he was in possession of the same undisclosed information, including his own knowledge—no later than 2021—that demand for ZoomInfo's offerings had deteriorated.

COMPLAINT AND JURY DEMAND - 32

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

## VIII.   The Truth Is Gradually Revealed

155.   The truth began to emerge through a series of partial disclosures beginning in late 2022 through mid-2024.

156.   As 2022 ended, Defendants could no longer conceal the drastically diminished demand for ZoomInfo's products or ZoomInfo's collectability problems.

157.   With it being inevitable that ZoomInfo would be forced to come clean at some point, Defendants released snippets of the true cause of ZoomInfo's financial decline over several months, allowing themselves to further reap a profit by selling their personal ZoomInfo shares.  In doing so, Defendants continued to conceal the full extent of the financial risk resulting from their failure to conduct due diligence into ZoomInfo's customers' ability to pay.

158.   On November 1, 2022, ZoomInfo disclosed that at the end of the third quarter 2022, the Company had experienced "a greater level of financial scrutiny from buyers, which further elongated sales cycles," and thus cautioned investors to "expect dollar-based net retention in 2022 to retrace the gains that we were able to achieve in 2021."

159.   ZoomInfo's stock fell $12.69 per share, or approximately 29%, to $30.81 on November 2, 2022.

160.   Analysts reacted negatively to this news.  Canaccord Genuity wrote that "this wasn't the update that we were expecting[.]  After all, management was pretty bullish at our conference in mid-August, and as late as mid-September at the Goldman event, the suggestion was that Q3 was not looking any worse than Q2."

161.   Hyzer nonetheless reassured investors that "gross retention continues to be really strong, over 90%," blaming "a worsening macro environment," while Schuck claimed ZoomInfo was "continuing to see really strong demand" but that "those deals are just taking longer to close."

162.   On November 16, 2022, Hyzer disclosed at a conference that increased customer scrutiny had continued into the fourth quarter and would negatively impact 2023 revenue growth, projecting "something that's more like a high-teens growth rate."

COMPLAINT AND JURY DEMAND - 33

163. Analysts again expressed shock and concern. Wolfe Research wrote that the disclosure "shocked many investors" because it was far below "the mid-20%+ many on the Street were modeling."

164. ZoomInfo's stock fell another 17%, from $31.69 to $26.17 per share, over the following two days.

165. Defendant Hyzer again blamed "macro headwinds" without disclosing the full extent of the Company's problems. Analysts nonetheless found it "hard to believe that the business has broken in this short of a time period" and continued to expect ZoomInfo to "maintain its strong unit economics."

166. On July 31, 2023, ZoomInfo released second quarter 2023 financial results, announcing a decline in customers with high-value ACVs.

167. Schuck cited "substantial" cuts for ZoomInfo's high-growth customers "in the context of a lower growth environment," while blaming increased cancellations on customers' "budgetary pressures" and touting "strong performance, with more pipeline created, higher win rates, faster close times, and higher ASPs."

168. The price of ZoomInfo's stock fell about 28%, from $25.57 to $18.40 per share, over the next two days.

169. UBS Research found the drop "well below investor expectations" and "even short of the bear case for a modest guide down."

170. Barclays nonetheless characterized the news as "more [] a reflection of the market rather than a ZI specific issue," and Morgan Stanley remained "encouraged by relative stability in gross retention and competitive win rates."

171. Schuck assured investors that ZoomInfo was retaining customers but seeing elongated renewal cycles, omitting that a large segment of the customer base—particularly SMBs—had been locked into previous renewals ZoomInfo knew they could not pay for, but which the Company nonetheless counted toward RPO.

COMPLAINT AND JURY DEMAND - 34

172. On May 7, 2024, Schuck revealed that SMB renewals decreased in the first quarter of 2024, causing net revenue retention to slide to 85% from 87% in the fourth quarter of 2023. ZoomInfo also reduced its annual revenue guidance from $1.26-1.28 billion to $1.255-1.27 billion.

173. ZoomInfo's stock fell from $16.02 to $12.14 per share, a 24% drop.

174. In response, Piper Sandler reported that analysts' "patience has worn thin in waiting for a fundamental recovery at ZI." When pressed for detail on SMB "weakness," Schuck stated: "It is fundamentally down-market. We're seeing much more of a macro effect than a competitive effect . . . we've not seen a material change in the competitive landscape or an increased impact to our business from competitors." Hyzer added that ZoomInfo was requiring "a majority of smaller and more risky clients" to pay at checkout.

175. On August 5, 2024, ZoomInfo shocked the market by announcing that it was incurring a $33 million charge because "the company made a change in estimates related to the collectability of receivables from customers and changed operational procedures to require upfront pre-payment for services from certain smaller customers."

176. ZoomInfo also decreased its revenue guidance by approximately $65 million.

177. Schuck explained to investors that "in 2022 and 2023, [the Company] extended credit to a higher mix of SMB customers, and the rate of non-payment by these customers increased throughout the past 24 months."

178. At the same time, ZoomInfo announced Hyzer's departure, appointing Graham O'Brien as interim CFO.

179. ZoomInfo's stock fell from $9.80 to $8.01 per share, an 18% drop.

180. Piper Sandler called the charge unexpected, noting the "magnitude of the more recent write-down and lowered guidance is surprising."

COMPLAINT AND JURY DEMAND - 35

## IX.   Defendants' Post-Relevant-Period Admissions

181.   On August 13, 2024, at the Canaccord Genuity Growth Conference, Schuck admitted that the root cause of the $33 million charge was that ZoomInfo "extended credit historically to customers who weren't creditworthy."

182.   Incoming CFO Graham O'Brien elaborated:  "In June [2023], the receivable cohort that began to progress through actually had a higher risk of non-payment than we had previously estimated.  And we applied that increased estimate to all the other cohorts that were progressing though the aging at that time.  That's what led to the revenue and bad debt charges you saw in our results in Q2."

183.   On November 12, 2024, during ZoomInfo's third quarter 2024 earnings call, Schuck stated that the Company's new business risk model "will remain a headwind to the optics of our growth in the coming quarters," that ZoomInfo "still [has] an elevated level of processing write-offs in Q3," and that "[t]he SMB segment, particularly the lowest end of the SMB, continues to be challenged, particularly from a net retention perspective."  ZoomInfo simultaneously announced a 3% decrease in full-year revenue guidance.

184.   On December 3-4, 2024, at the UBS Global Technology & AI Conference and the Wells Fargo 8th Annual TMT Summit, O'Brien further explained:  "[L]ate in 2023 and into 2024, we started to experience incremental weakness in our SMB, our small and medium-sized businesses.  And that showed up kind of in two forms.  In late 2023, showed up in an increase in our write-off rate or our non-collection of cash.  So, that led to more bad debt expense, that led to us upping reserves at that time.  And then, in Q2 of this year, we saw an incremental increase there . . . .  We also saw SMB retention get worse this year than it was year-to-date last year."

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS

185.   On August 6, 2021, ZoomInfo filed a Form S-3 Registration Statement and accompanying Prospectus (collectively, the "Registration Statement") with the SEC.

COMPLAINT AND JURY DEMAND - 36

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

186.    The Registration Statement incorporated by reference and treated part thereof a number of previously filed documents, including ZoomInfo's (1) Annual Report on Form 10-K for the fiscal year ended December 31, 2020, filed on February 26, 2021 ("2020 10-K"); (2) Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2021, filed on May 3, 2021 ("Q1 2021 10-Q"); and (3) Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2021, filed on August 2, 2021 ("Q2 2021 10-Q").

187.    The Registration Statement was signed by, among others, Defendants Schuck and Hyzer.

188.    The 2020 10-K, which was signed by, among others, Defendants Schuck and Hyzer, reported ZoomInfo's RPO as follows:



|  | Current | Noncurrent | Total |
|---|---|---|---|
| As of December 31, 2020 | $ 432.2 | $ 126.8 | $ 559.0 |
| As of December 31, 2019 | $ 266.6 | $ 74.1 | $ 340.7 |

189.    These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading.  ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

190.    The Q1 2021 10-Q, which was signed by Defendant Hyzer, reported ZoomInfo's RPO as follows:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of March 31, 2021 | $ 461.3 | $ 130.3 | $ 591.6 |

COMPLAINT AND JURY DEMAND - 37

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

191.    These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

192.    The Q2 2021 10-Q, which was signed by Defendant Hyzer, reported ZoomInfo's RPO as follows:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of June 30, 2021 | $ 505.2 | $ 142.9 | $ 648.1 |

193.    These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

COMPLAINT AND JURY DEMAND - 38

194.    On November 1, 2021, ZoomInfo filed its Form 10-Q containing its financial results for the quarter ended September 30, 2021 ("Q3 2021 10-Q").  The Q3 2021 10-Q, which was signed by Defendant Hyzer, reported ZoomInfo's RPO as follows:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of September 30, 2021 | $ 552.2 | $ 160.0 | $ 712.3 |

195.    These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading.  ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

196.    That same day, ZoomInfo held its earnings call to discuss its financial results with analysts and investors.  During that call, Defendant Hyzer stated:

> With respect to liabilities and future performance obligations, . . . remaining performance obligations, or RPO, were $712 million, of which $552 million are expected to be delivered in the next 12 months.

197.    This statement was materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially

COMPLAINT AND JURY DEMAND - 39

false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

198. On February 15, 2022, ZoomInfo held its earnings call for the fourth quarter and full year 2021 results. In response to an analyst's question about demand, Defendant Schuck stated:

> [W]e're constantly looking at the data, the historical data. We look at win rates, funnel conversion, top of funnel activity. And we spent a real amount of time looking for anomalies that we could tie back to some relation to COVID. And we didn't see anything that [would cause us to] believe that the current strong demand trends we're seeing wouldn't continue or one-offy or a pull-forward. And we wanted to be confident about that because it would affect the way we operate the business. We didn't see any anomalies like that that made us think that COVID caused a pull-forward in the demand environment that we're seeing today wouldn't continue.

199. Defendant Schuck's statement that "we didn't see anything that [would cause us to] believe that the current strong demand trends we're seeing wouldn't continue or one-offy or a pull-forward" was materially false and/or misleading because the Company had already received a marketing survey showing a drastic erosion of market share. Defendants had received concrete evidence showing that the sales it captured years prior were indeed attributable to a temporary spike, contrary to Schuck's statement.

200. During that same call, Defendant Hyzer stated:

> With respect to liabilities and future performance obligations, . . . remaining performance obligations, or RPO, were $864 million, of which $672 million are expected to be delivered in the next 12 months.

201. This statement was materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the

COMPLAINT AND JURY DEMAND - 40

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

202. On February 16, 2022, Defendant Schuck was interviewed by Yahoo Finance. During that interview, Schuck stated:

> [O]ne thing that's interesting about our company is that there's a lot of talk about whether COVID and the pandemic had a pull forward in demand for us. And really, what we've realized are two things. One, we went back and we looked at all of our numbers—win rates, funnel conversion, top of the funnel pipeline generation—from before the pandemic today, and we looked for any anomalies that could have indicated that we had this pull forward in demand that came from COVID. And we didn't see anything in the data that would help—that would make us think that.

203. Defendant Schuck's denial that COVID had created a pull-forward in demand was materially false and/or misleading because the Company had already received a marketing survey showing a drastic erosion of market share. Defendants had received concrete evidence showing that the sales it captured years prior were indeed attributable to a temporary spike, contrary to Schuck's statement.

204. On February 24, 2022, ZoomInfo filed its Form 10-K containing its financial results for the year ended December 31, 2021 ("2021 10-K"). The 2021 10-K, which was signed by Defendants Schuck and Hyzer, reported ZoomInfo's RPO as follows:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of December 31, 2021 | $ 671.5 | $ 192.9 | $ 864.4 |
| As of December 31, 2020 | $ 432.2 | $ 126.8 | $ 559.0 |

205. These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market

COMPLAINT AND JURY DEMAND - 41

customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading.  ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

206.    On May 2, 2022, ZoomInfo filed its Form 10-Q containing its financial results for the quarter ended March 31, 2022 ("Q1 2022 10-Q").  The Q1 2022 10-Q, which was signed by Defendant Hyzer, reported ZoomInfo's RPO as follows:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of March 31, 2022 | $ 715.0 | $ 202.6 | $ 917.6 |

207.    These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading.  ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

208.    That same day, ZoomInfo held its earnings call to discuss its financial results with analysts and investors.  During that call, Defendant Hyzer stated:

> With respect to liabilities and future performance obligations, . . . remaining performance obligations or RPO were $918 million, of which $715 million are expected to be delivered in the next 12 months.

COMPLAINT AND JURY DEMAND - 42

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

209.    This statement was materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

210.    On August 1, 2022, ZoomInfo filed its Form 10-Q containing its financial results for the quarter ended June 30, 2022 ("Q2 2022 10-Q"). The Q2 2022 10-Q, which was signed by Defendant Hyzer, reported ZoomInfo's RPO as follows:

| *(in millions)* | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of June 30, 2022 | $ 764.2 | $ 220.5 | $ 984.7 |

211.    These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

COMPLAINT AND JURY DEMAND - 43

212.    That same day, ZoomInfo held its earnings call to discuss its financial results with analysts and investors.  During that call, Defendant Hyzer stated:

> With respect to liabilities and future performance obligations, . . . [our] remaining performance obligations, or RPO, were $985 million, of which $764 million are expected to be delivered in the next 12 months.

213.    This statement was materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading.  ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

214.    On November 1, 2022, ZoomInfo filed its Form 10-Q containing its financial results for the quarter ended September 30, 2022 ("Q3 2022 10-Q").  The Q3 2022 10-Q, which was signed by Defendant Hyzer, reported ZoomInfo's RPO as follows:



| | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of September 30, 2022 | $    756.9 | $    221.9 | $    978.8 |

215.    These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially

COMPLAINT AND JURY DEMAND - 44

false and/or misleading.  ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

216.    That same day, ZoomInfo held its earnings call to discuss its financial results with analysts and investors.  During that call, Defendant Hyzer stated:

> With respect to liabilities and future performance obligations, . . . remaining performance obligations or RPO were $979 million, of which $757 million are expected to be delivered in the next 12 months.

217.    This statement was materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading.  ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

218.    On that same earnings call, an analyst asked about renewals and if customers were "looking to downsize" or were "looking for more flexible payment terms."  Defendant Hyzer responded by stating, "from a renewals perspective, we're actually seeing continued levels of really high gross retention. So, we're continuing to see those renewals happen."  Defendant Hyzer also stated that "gross retention continues to be really strong, over 90%."

219.    This statement was materially false and/or misleading because it failed to inform investors of the Company's difficulty retaining customers—especially those in its SMB customer segment—that were adhesively locked into renewals that they could not pay for as a result of

COMPLAINT AND JURY DEMAND - 45

ZoomInfo's failure to conduct due diligence into its customers' ability to pay for their subscription contracts.

220.    On November 16, 2022, Defendant Hyzer spoke at the RBC Global Technology, Media & Telecom Conference. During his remarks, Hyzer stated: "[W]e are seeing macro headwinds that are impacting the business and manifesting itself in terms of longer sales cycles. In September, we did see increased pressure with respect to macro headwinds and more scrutiny from buyers that really impacted the capacity of our sales team."

221.    This statement was materially false and/or misleading because it continued to conceal the full extent of ZoomInfo's financial problems caused by its years of selling to customers without performing due diligence into their ability to pay, and issuing false and misleading financial figures in connection therewith, including not writing down uncollectable accounts.

222.    On February 6, 2023, ZoomInfo held its earnings call for the fourth quarter and full year 2022 results. During that call, Defendant Hyzer stated:

> With respect to liabilities and future performance obligations, . . .
> remaining performance obligations, or RPO, were $1.1 billion, of
> which $842 million are expected to be delivered in the next 12
> months.

223.    This statement was materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

COMPLAINT AND JURY DEMAND - 46

224. On February 16, 2023, ZoomInfo filed its Form 10-K containing its financial results for the year ended December 31, 2022 ("2022 10-K"). The 2022 10-K, which was signed by Defendants Schuck and Hyzer, reported ZoomInfo's RPO as follows:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of December 31, 2022 | $ 842.2 | $ 264.5 | $ 1,106.7 |
| As of December 31, 2021 | $ 671.5 | $ 192.9 | $ 864.4 |

225. These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

226. On May 1, 2023, ZoomInfo filed its Form 10-Q containing its financial results for the quarter ended March 31, 2023 ("Q1 2023 10-Q"). The Q1 2023 10-Q, which was signed by Defendant Hyzer, reported ZoomInfo's RPO as follows:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of March 31, 2023 | $ 839.2 | $ 253.3 | $ 1,092.5 |

227. These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of

COMPLAINT AND JURY DEMAND - 47

this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading.  ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

228.    That same day, ZoomInfo held its earnings call to discuss its financial results with analysts and investors.  During that call, Defendant Hyzer stated:

> With respect to liabilities and future performance obligations, . . . remaining performance obligations, or RPO, were $1.1 billion, of which $839 million are expected to be delivered in the next 12 months

229.    This statement was materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company.  Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading.  ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable.  Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

230.    On July 31, 2023, ZoomInfo filed its Form 10-Q containing its financial results for the quarter ended June 30, 2023 ("Q2 2023 10-Q").  The Q2 2023 10-Q, which was signed by Defendant Hyzer, reported ZoomInfo's RPO as follows:

| (in millions) | Recognized within one year | | Noncurrent | | Total |
|---|---|---|---|---|---|
| As of June 30, 2023 | $ | 848.7 | $ | 262.2 | $  1,110.9 |

231.    These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer

COMPLAINT AND JURY DEMAND - 48

due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

232.    That same day, ZoomInfo held its earnings call to discuss its financial results with analysts and investors. During that call, Defendant Hyzer stated:

> With respect to liabilities and future performance obligations, . . . remaining performance obligations, or RPO, were $1.1 billion, of which $849 million are expected to be delivered in the next 12 months.

233.    This statement was materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

234.    During that earnings call, Defendants also continued to reassure investors that increased cancellations resulted from "budgetary pressures and their corresponding downward pressure on renewals." Specifically, Defendant Schuck assured investors that the Company's SMB segment, in particular, remained strong, stating: "In the SMB segment, where we see lower-priced and lower-quality competitors, we still see strong performance, with more pipeline created,

COMPLAINT AND JURY DEMAND - 49

higher win rates, faster close times, and higher ASPs. Metrics that also indicate our value proposition when compared to our competition remains obvious."

235. Defendant Schuck also assured the market that, overall, the Company was retaining customers but continuing to see elongated renewal cycles, stating "we do expect gross retention to tick down a little, but more of the net retention in terms of our expectation is being impacted by fewer upsells and more downsells. So it's more we're keeping those customers, but we're seeing the renewals being more challenging. And so yes, I think that's the real focus with respect to gross retention in 2023."

236. These statements were materially false and/or misleading because they concealed the full extent of the Company's financial risk related to customers—particularly SMBs—that entered into uncollectable contracts as a result of the Company's sales-at-any-cost strategy, without the Company undertaking any due diligence. They also omitted that a large segment of ZoomInfo's customer base—particularly SMBs—had been locked into previous renewals for subscriptions that ZoomInfo knew they could not pay but were nevertheless counting as a way to inflate its RPO figures.

237. On October 30, 2023, ZoomInfo filed its Form 10-Q containing its financial results for the quarter ended September 30, 2023 ("Q3 2023 10-Q"). The Q3 2023 10-Q, which was signed by Defendant Hyzer, reported ZoomInfo's RPO as follows:

| (in millions) | Recognized within one year | Noncurrent | Total |
|---|---|---|---|
| As of September 30, 2023 | $ 795.2 | $ 261.5 | $ 1,056.7 |

238. These financial figures were materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of

COMPLAINT AND JURY DEMAND - 50

this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

239.    That same day, ZoomInfo held its earnings call to discuss its financial results with analysts and investors. During that call, Defendant Hyzer stated:

> With respect to liabilities and future performance obligations, . . . remaining performance obligations or RPO were $1.1 billion, of which $795 million are expected to be delivered in the next 12 months.

240.    This statement was materially false and/or misleading because ZoomInfo's RPO figures were overstated due to the undisclosed, increased risk of nonpayment as a result of Defendants' directive that ZoomInfo close deals quickly without conducting customer due diligence, which resulted in large amounts of customers—particularly SMB and Mid-Market customers—having an increased likelihood of not satisfying their financial obligations to the Company. Defendants' failure to conduct a variable constraint analysis to assess the likelihood of this occurring, as required by GAAP and ASC 606, also rendered these financial figures materially false and/or misleading. ZoomInfo's RPO was further inflated because the Company did not write down bad debts that were uncollectable. Instead, to retain the appearance of revenue, ZoomInfo left these as accounts receivable for hundreds of days despite their ongoing delinquency.

241.    On May 7, 2024, ZoomInfo held an earnings call for its first quarter of 2024. During the call, Defendant Hyzer stated, "SMB actually held in reasonably well as we went through 2023, but really in Q1, we've seen a change in that trend. It does feel like the SMB cohort is more sensitive to the higher rates for longer discussion that we've seen over the last few months."

242.    This statement was materially false and/or misleading because the Company had, for years prior, failed to conduct any due diligence into its customers' ability to pay and in accordance with GAAP, and had reported RPO without accounting for that analysis or writing off doubtful accounts or bad debt. This statement omitted the full extent of financial risk that flowed

COMPLAINT AND JURY DEMAND - 51

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

from the Company's prior years of selling to large amounts of unvetted customers and inflating its RPO and, in turn, revenue figures by failing to account for collectability risk.

**SUMMARY OF DEFENDANTS' SCIENTER**

243.    Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

244.    The Individual Defendants acted with scienter with respect to the materially false and misleading statement of material fact set forth above because they knew, or at the very least recklessly disregarded, that the statements were false or misleading when made.  As the most senior executives of ZoomInfo during the relevant time period, the Individual Defendants' scienter is imputable to ZoomInfo.

245.    ***Core Operations and Close, Detail-Oriented Monitoring***.

    a.    Given that RPO and retention were ZoomInfo's core operational metrics, and given Schuck's and Hyzer's own repeated public statements describing this detail-oriented management style, they clearly were aware of the true state of ZoomInfo's only revenue source—the number and health of its subscription accounts.

    b.    Subscriptions to ZoomInfo's intelligence platform accounted for nearly 100% of the Company's revenue according to its 2021, 2022, and 2023 Forms 10-K.  As Hyzer put it, "the beauty of our business is that it is 100% subscription-based business, which means that what we're recognizing as revenue is really the best indicator of what we're servicing for our customers."

    c.    In a March 14, 2024 interview, Hyzer stated of the metrics ZoomInfo reported to the market: "[t]hose are the metrics that I wake up every day and like think about, that Henry [Schuck] wakes up every day and thinks about."  Schuck separately stated, "[t]here's a whole bunch of data that shows you the rhythm of the business.  Without visibility, you cannot properly run the business," and Hyzer stated, "we're tracking internally like usage on all of these different products, and where things

COMPLAINT AND JURY DEMAND - 52

are falling off . . . making sure we're staying focused on those metrics for the future."

d. CW-3 independently confirmed that Hyzer personally addressed the Accounts Receivable team's failure to follow proper accounting guidelines at Accounting-department all-hands meetings that Hyzer led.  CW-3's account establishes that Hyzer directly and personally addressed ZoomInfo's collectability problems with Company personnel during the relevant period, corroborating the inference that Hyzer had actual, first-hand knowledge of the undisclosed accounting problems.

e. Indeed, as the Court found in denying Defendant's motion to dismiss the Class Complaint:  "Taken together, the core operations doctrine and the statements by Individual Defendants suggesting they closely monitored company data support an inference of scienter."  (Class MTD Order at 46.)

246. ***Former Employees' Direct Accounts of Executive Knowledge***.

a. Multiple former employees of ZoomInfo have offered specific, corroborative detail regarding the Individual Defendants' knowledge and mental state.

b. These are not merely generalized allegations of a corporate sales push. For example, according to the Class Complaint, FE-2 and FE-3 both stated that Schuck personally led ZoomInfo's aggressive sales directive.  FE-2 recalled Schuck's "all-hands-on-deck" instruction, and FE-3 recalled Schuck's insistence that the Company "just sell, sell, sell, sell" and "sold to anyone with a pulse, basically." (Class Compl. ¶¶ 427-30.)  FE-11 claims that she advised Schuck and Hays of ZoomInfo's impending downturn in 2021.  (*Id.* ¶ 159.)  Other former employee allegations in the Class Complaint state that account health information could be reviewed in centralized data systems, which reflected low utilization rates and a high likelihood of nonpayment, and Defendants Schuck and Hyzer presented this date at quarterly meetings.  (*Id.* ¶¶ 303-09)

COMPLAINT AND JURY DEMAND - 53

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

c. The Court has already credited these accounts as supporting scienter. (Class MTD Order at 42-43.)

d. Moreover, as described above, Plaintiffs' investigator was able to locate some of the former employees and confirm several of the allegations attributed to them in the Class Complaint. In addition, Plaintiffs' investigator spoke with other former employees who provided similar or additional details supporting an inference of scienter.

247. **Post-Relevant-Period Admissions**.

a. In December 2024, O'Brien admitted: "[L]ate in 2023 and into 2024, we started to experience incremental weakness in our SMB, our small and medium-sized businesses. And that showed up kind of in two forms. In late 2023, showed up in an increase in our write-off rate or our non-collection of cash. So, that led to more bad debt expense, that led to us upping reserves at that time. And then, in Q2 of this year, we saw an incremental increase there . . . . We also saw SMB retention get worse this year than it was year-to-date last year."

b. This Court found that O'Brien's admission that ZoomInfo experienced rising SMB write-offs as early as "late 2023" directly "contradicts the substance of ZoomInfo's RPO estimates in late 2023 . . . and it would have been critical context for investors before ZoomInfo's share price dropped from $18.40 in August 2023 to $9.80 in August 2024."

c. It thus independently supports an inference that Defendants knew, and concealed, the truth before it was disclosed.

248. **SOX Certifications**.

a. Schuck and Hyzer each signed SOX certifications attesting to the accuracy of ZoomInfo's quarterly and annual SEC reports as well as to the adequacy of the Company's disclosure procedures and controls.

COMPLAINT AND JURY DEMAND - 54

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

b. Investors reasonably understood these certifications as Schuck's and Hyzer's word—based on their own evaluations—that ZoomInfo's financial reporting was accurate and complete, and that they were being apprised of all material information.

c. Contrary to those certifications, Schuck and Hyzer knew—or at the very least were severely reckless in not knowing—that ZoomInfo's financial reporting contained material misstatements resulting from years of aggressive sales practices that involved signing contracts without any due diligence into customers' ability to pay, and from allowing delinquent accounts to sit as accounts receivable for months without write-down.

d. Given that Schuck and Hyzer closely tracked ZoomInfo's performance metrics, as alleged above, the Court found that their SOX certifications are part of the broader, holistic picture supporting scienter. (Class MTD Order at 43-44.)

## **PLAINTIFFS' ACTUAL RELIANCE**

249. With respect to their investments in ZoomInfo common stock that are the subject of this Complaint, Plaintiffs were advised by Jennison, a New York-based investment adviser.

250. Plaintiffs, through Jennison, actually read or heard, reviewed, and justifiably relied on the representations set forth above prior to purchasing ZoomInfo common stock on the dates set forth in Exhibits A-J to the extent each such statement had been made at the time of purchase.

251. Prior to purchasing ZoomInfo common stock on behalf of Plaintiffs, or continuing to hold ZoomInfo stock, an investment professional at Jennison actually read or heard, reviewed, and justifiably relied on ZoomInfo's SEC filings as well as Defendants' other public statements including, as applicable, Defendants' statements regarding ZoomInfo's remaining performance obligations, demand trends, and customer retention.

252. As Jennison continued to purchase ZoomInfo common stock on behalf of Plaintiffs, an investment professional at Jennison kept abreast of publicly disclosed developments concerning

COMPLAINT AND JURY DEMAND - 55

ZoomInfo and, prior to purchasing ZoomInfo stock, actually read or heard, reviewed, and justifiably relied on ZoomInfo's SEC filings as well as Defendants' other public statements including, as applicable, Defendants' statements regarding ZoomInfo's remaining performance obligations, demand trends, and customer retention.

253.    Each of Defendants' statements were material to Jennison's decision to purchase or hold ZoomInfo common stock on behalf of Plaintiffs.

254.    To the extent that each such statement had been made at the time of purchase, Jennison actually and justifiably relied on Defendants' statements regarding ZoomInfo's remaining performance obligations, demand trends, and customer retention in making each purchase of ZoomInfo common stock on behalf of Plaintiffs, as set forth in Exhibits A-J.

255.    Plaintiffs' reliance on these statements of material fact was reasonable and justifiable.  Plaintiffs were open-market purchasers of ZoomInfo common stock that did so based on Defendants' representations.

### PRESUMPTION OF RELIANCE

256.    Plaintiffs also intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (1) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (2) the omissions and misrepresentations were material; (3) ZoomInfo common stock traded in an open and efficient market; (4) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of ZoomInfo common stock; and (5) Plaintiffs purchased or acquired ZoomInfo common stock between the time when Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

257.    The market for ZoomInfo common stock was open, well-developed and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements, ZoomInfo common stock traded at artificially inflated prices during the relevant period.  The

COMPLAINT AND JURY DEMAND - 56

artificial inflation dissipated as the market learned of the nature and extent of Defendants' misrepresentation regarding the lack of any meaningful churn being observed internally.

258.    At all relevant times, the market for ZoomInfo common stock was efficient for the following reasons, among others: (1) ZoomInfo filed periodic reports with the SEC; (2) ZoomInfo common stock met the requirements for listing, was listed and actively and highly traded on the Nasdaq, a highly efficient market, during the time that Plaintiffs purchased or acquired ZoomInfo common stock; (3) numerous analysts followed ZoomInfo, each of which wrote reports that were publicly available and entered the public marketplace; and (4) ZoomInfo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.  As a result, the market for ZoomInfo common stock promptly digested current information regarding ZoomInfo from all publicly available sources and such information was reflected in ZoomInfo's stock price.

259.    Plaintiffs relied on the market price of ZoomInfo's common stock, which reflected all the information in the market, including the misstatements by Defendants.

260.    In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose.

**LOSS CAUSATION**

261.    As the truth about Defendants' fraud was gradually but only partially revealed to the market, the price of ZoomInfo's common stock plummeted and Plaintiffs suffered significant investment losses.

262.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased ZoomInfo

COMPLAINT AND JURY DEMAND - 57

common stock, as set forth in Exhibits A-J, the market price of that common stock was artificially inflated as a direct result of Defendants' materially false and misleading statements. Specifically, Defendants' statements regarding ZoomInfo's remaining performance obligations, demand trends, and customer retention caused the price of ZoomInfo common stock to be artificially inflated.

263.    As described above in paragraphs 155 through 180, as a series of partial but inadequate disclosures were issued partially revealing the false and misleading nature of Defendants' statements regarding ZoomInfo's remaining performance obligations, demand trends, and customer retention, and as the foreseeable risks previously concealed by Defendants' material misrepresentations and omissions partially materialized, the price of ZoomInfo common stock plummeted and Plaintiffs were damaged.

### NO SAFE HARBOR

264.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the statements pleaded herein were not forward-looking statements. To the extent there were forward-looking statements, some were not identified as forward-looking and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. For the remaining forward-looking statements, they failed to alert investors that some of the risks may have already come to fruition. Moreover, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ZoomInfo who knew that those statements were false when made.

COMPLAINT AND JURY DEMAND - 58

## FIRST CAUSE OF ACTION
### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5(b) Against Defendants ZoomInfo, Schuck, and Hyzer

265.     Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

266.     This cause of action is brought against Defendants ZoomInfo, Schuck, and Hyzer for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b).

267.     Defendants ZoomInfo, Schuck, and Hyzer, both directly and indirectly, used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements alleged herein to:  (1) deceive the investing public, including Plaintiffs, as alleged herein; (2) artificially inflate and maintain the market price of ZoomInfo common stock; and (3) cause Plaintiffs to purchase ZoomInfo common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants ZoomInfo, Schuck, and Hyzer took the actions set forth above.

268.     Defendants ZoomInfo, Schuck, and Hyzer, both directly and indirectly made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading in an effort to artificially inflate and maintain the market prices for ZoomInfo common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

269.     By virtue of their high-level positions at ZoomInfo, Defendants Schuck and Hyzer were authorized to make public statements, and made public statements, on ZoomInfo's behalf. Schuck and Hyzer were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of ZoomInfo's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

270.     In addition, Defendants ZoomInfo, Schuck, and Hyzer had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so

COMPLAINT AND JURY DEMAND - 59

that the market price of ZoomInfo common stock would be based on truthful, complete, and accurate information.

271.    Defendants ZoomInfo, Schuck, and Hyzer acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them. Defendants ZoomInfo's, Schuck's, and Hyzer's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth. By concealing these material facts from investors, Defendants ZoomInfo, Schuck, and Hyzer supported the artificially inflated price of ZoomInfo common stock.

272.    The dissemination of the materially false and misleading information, as set forth above, artificially inflated the market price of ZoomInfo common stock. In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which ZoomInfo's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by Defendants but not disclosed in public statements by Defendants, Plaintiffs purchased ZoomInfo common stock at artificially inflated prices. As a series of partial but inadequate disclosures were issued and the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized, the price of ZoomInfo common stock substantially declined.

273.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth, which was concealed by Defendants, Plaintiffs would not have purchased ZoomInfo common stock.

274.    By virtue of the foregoing, Defendants ZoomInfo, Schuck, and Hyzer have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

275.    As a direct and proximate result of Defendants ZoomInfo's, Schuck's, and Hyzer's wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in ZoomInfo common stock.

276.    Taking into account, *inter alia*, the tolling of the limitations period by the filing of the Class Complaint against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

**SECOND CAUSE OF ACTION**
**Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5(a) and (c) Against All Defendants**

277.    Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

278.    This cause of action is brought against Defendants ZoomInfo, Schuck, Hyzer, and Hays for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5(a), (c), each of whom engaged in his own deceptive conduct—beyond making false statements—as part of a scheme to defraud investors. Plaintiffs are not required to allege, and do not rely solely upon, any misrepresentation or omission for which Defendants may separately be liable under Rule 10b-5(b).

279.    Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate the price of ZoomInfo common stock; and (iii) cause Plaintiffs to purchase ZoomInfo common stock at artificially inflated prices.

280.    Specifically, Defendants' actions and course of business conduct were designed to convince investors that the Company had strong and growing demand that was not due to the COVID-19 pandemic and would continue as the pandemic faded.

281.    Defendants' fraudulent scheme also involved contracting with risky SMB and Mid-Market customers, whose ability to pay was not vetted and would bring collectability problems.

COMPLAINT AND JURY DEMAND - 61

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

At the same time Defendants touted that their customer growth in these two segments was sustainable.  Defendants concealed the collectability problem associated with SMB and Mid-Market customers.  As a result, investors did not know that the Company was facing issues collecting payment from customers which would impact their financial results.

282.   Moreover, a key aspect of their fraudulent scheme, the Individual Defendants sold more than $1 billion worth of ZoomInfo stock while the stock price was artificially inflated due to their fraudulent scheme.  Indeed, Defendants manipulated ZoomInfo's accounting metrics to falsely convey that the Company was enjoying strong financial success and growing demand to artificially inflate the stock price prior to offloading their shares.

283.   Defendants' scheme unraveled through a series of disclosures revealing that the Company was facing collectability issues from SMB and Mid-Market customers.  On August 5, 2024, the Company announced it was incurring a $33 million charge due to customer non-payment and that they would now require pre-payment from smaller customers.

284.   Defendants directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to perpetrate this fraud.

285.   Defendants had actual knowledge of the deceptive conduct alleged herein, or acted with deliberate reckless disregard for the effect of their deceptive conduct.  The facts demonstrating that Defendants acted with actual knowledge and/or deliberate recklessness are stated above.

286.   Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices and course of business included the knowing and/or reckless suppression and concealment of their scheme to defraud investors concerning, among other things that ZoomInfo's demand and growth from SMB and Mid-Market Customers was risky and unsustainable.

COMPLAINT AND JURY DEMAND - 62

287.    Despite the numerous misrepresentations that were made to the market—and ample opportunity to supplement, alter, or correct such misrepresentations—Defendants failed to do so thereby concealing their scheme to defraud investors.

288.    Plaintiffs reasonably relied on the integrity of the market in which ZoomInfo's common stock traded.

289.    Plaintiffs were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or impact of the fraudulent scheme.  Had Plaintiffs known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased ZoomInfo's common stock.

290.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs suffered damages in connection with their purchases of ZoomInfo common stock.

291.    By reason of the foregoing, Defendants, violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs for damages suffered in connection with their purchase of ZoomInfo common stock.

292.    Taking into account, *inter alia*, the tolling of the limitations period by the filing of the Class Complaint against Defendants in the Class Action, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

### THIRD CAUSE OF ACTION
**Violations of Section 20(a) of the Exchange Act**
**Against Defendants Schuck, Hyzer, and Hays**

293.     Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

294.    This cause of action is brought against Defendants Schuck, Hyzer, and Hays for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

COMPLAINT AND JURY DEMAND - 63

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

295.    Defendants Schuck, Hyzer, and Hays were controlling persons of ZoomInfo within the meaning of Section 20(a) of the Exchange Act.

296.    By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, ZoomInfo's operations and/or knowledge or reckless disregard of the materially false and misleading statements filed with the SEC or disseminated to the investing public, Defendants Schuck, Hyzer, and Hays had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

297.    Defendants Schuck, Hyzer, and Hays were provided with or had unlimited access to copies of ZoomInfo's press releases, scripts, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, Defendants Schuck, Hyzer, and Hays had direct and supervisory involvement in the day-to-day operations of ZoomInfo and therefore are presumed to have had the power to control or influence the particular false and misleading statements giving rise to the securities violations alleged herein.

298.    Defendants Schuck, Hyzer, and Hays culpably participated in ZoomInfo's violation of Section 10(b) and Rule 10b-5 with respect to the First Cause of Action and the Second Cause of Action.

299.    By reason of the conduct alleged in the First Cause of Action and the Second Cause of Action, ZoomInfo is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Schuck, Hyzer, and Hays are liable pursuant to Section 20(a) based on their control of ZoomInfo.

300.    Defendants Schuck, Hyzer, and Hays are liable for the aforesaid wrongful conduct and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of ZoomInfo common stock.

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

301.    Taking into account, *inter alia*, tolling of the limitations period by the filing of the Class Complaints against Defendants in the Class Action and the filing of Plaintiffs' own Complaint, Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## FOURTH CAUSE OF ACTION
**Common Law Fraud**
**Against Defendants ZoomInfo, Schuck, and Hyzer**

302.    Plaintiffs repeat and re-allege each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

303.    This cause of action is brought against Defendants ZoomInfo, Schuck, and Hyzer for violations of the common law.

304.    Defendants ZoomInfo, Schuck, and Hyzer made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading to induce Plaintiffs to purchase or hold ZoomInfo common stock.  Specifically, Defendants made material misrepresentations or omitted material facts about ZoomInfo's remaining performance obligations, demand trends, and customer retention.

305.    Defendants ZoomInfo, Schuck, and Hyzer knew that their statements were false when made or omitted material facts or, at the very least, made the statements with reckless disregard for their truth.  As high-level executives at ZoomInfo, Defendants Schuck's and Hyzer's scienter is imputable to ZoomInfo.

306.    Defendants knew that investors like Plaintiffs would review and rely on such misrepresentations and intended that their false and/or misleading statements and omissions would induce Plaintiffs to purchase or hold ZoomInfo common stock at inflated prices.

307.    These statements were material to Plaintiffs and Plaintiffs actually, reasonably, and justifiably relied on them when purchasing or holding ZoomInfo common stock.  At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and

COMPLAINT AND JURY DEMAND - 65

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

believed them to be true.  Had Plaintiffs known the truth, which was concealed by Defendants, Plaintiffs would not have purchased or continued to hold ZoomInfo common stock.

308.    As a direct and proximate result of Defendants ZoomInfo's, Schuck's, and Hyzer's, wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in ZoomInfo common stock.

309.    Defendant ZoomInfo's, Schuck's, and Hyzer's wrongful conduct, as described above, was malicious, reckless, willful, and was directed at the general investing public. Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

### FIFTH CAUSE OF ACTION
**Negligent Misrepresentation**
**Against Defendants ZoomInfo, Schuck, and Hyzer**

310.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 242, 249 through 255, and 261 through 263 as if fully set forth herein.

311.    This cause of action is brought against Defendants ZoomInfo, Schuck, and Hyzer for violations of the common law.

312.    Defendants ZoomInfo, Schuck, and Hyzer authorized or caused the representations and/or omissions set forth above.

313.    Defendants ZoomInfo, Schuck, and Hyzer intended to supply false information for Plaintiffs to use in making investment decisions and intended for the false information to be used by Plaintiffs when making investment decisions.

314.    Defendants ZoomInfo, Schuck, and Hyzer had no reasonable grounds for believing their representations were true when made or, at the very least, knew that their representations were materially misleading.

315.    Defendants ZoomInfo, Schuck, and Hyzer had a duty to exercise reasonable care and competence in providing information about ZoomInfo to Plaintiffs.

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

316. Defendants ZoomInfo, Schuck, and Hyzer made misrepresentations that they knew, or should have known, to be false or misleading in order to induce investors, including Plaintiffs, to purchase ZoomInfo common stock.

317. Defendants ZoomInfo, Schuck, and Hyzer breached their duty to exercise reasonable care in making these representations to Plaintiffs.

318. Plaintiffs reasonably and justifiably relied on such misrepresentations. But for Defendants ZoomInfo's, Schuck's, and Hyzer's misrepresentations, Plaintiffs would not have purchased ZoomInfo common stock, or if they had purchased such common stock, they would not have done so at the artificially inflated prices that they paid.

319. As a direct and proximate result of Defendants ZoomInfo's, Schuck's, and Hyzer's wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in ZoomInfo common stock as described above and to be proven at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

a. Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

b. Awarding Plaintiffs punitive damages for Defendants' intentional, malicious, willful, and wanton conduct as detailed above;

c. Awarding Plaintiffs their expenses, attorneys' fees, and costs; and

d. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

//

//

//

COMPLAINT AND JURY DEMAND - 67

FENNEMORE CRAIG, P.C.
999 Third Avenue, Suite 600
Seattle, Washington 98104
(206) 749-0500

DATED:  August 5, 2026

FENNEMORE CRAIG, P.C.


By:    /s/ Jacob P. Freeman
        Jacob P. Freeman, WSBA No. 54123
        999 Third Avenue, Suite 600
        Seattle, Washington 98104
        Telephone: (206) 749-0500
        Facsimile: (206) 749-0600
        jfreeman@fennemorelaw.com

ROLNICK KRAMER SECURITIES LITIGATION LLP

        Lawrence M. Rolnick (*pro hac vice forthcoming*)
        Michael J. Hampson (*pro hac vice forthcoming*)
        PENN 1, Suite 3401
        One Pennsylvania Plaza
        New York, New York 10119
        Telephone: (212) 597-2800
        lrolnick@rksllp.com
        mhampson@rksllp.com

*Attorneys for Plaintiffs*

COMPLAINT AND JURY DEMAND - 68